

## COURT OF APPEALS
## EIGHTH DISTRICT OF TEXAS
## EL PASO, TEXAS

| | | |
|---|---|---|
| MOISES GALVAN, | § | No. 08-23-00346-CR |
| Appellant, | § | Appeal from the |
| v. | § | 168th Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20170D00969) |

### <u>MEMORANDUM OPINION</u>

Appellant Moises Galvan appeals his conviction for murder and aggravated assault with a deadly weapon, resulting in concurrent 55-year and 13-year prison terms and two $10,000 fines. He seeks a new trial asserting jury-charge error, erroneous exclusion of an expert opinion, and cumulative error. Galvan also seeks a judgment of acquittal based on a claimed failure to accord him a speedy trial. For the following reasons, we affirm the judgment of the trial court.

### I. FACTUAL AND PROCEDURAL BACKGROUND

A grand jury indicted Galvan for a January 29, 2017 shooting that resulted in bodily injury to David Ortega and the death of 22-year-old Rogelio Franco, Jr. The shooting occurred outside of an El Paso bar called the Bar Fly. The jury heard from two eyewitnesses to the shooting—David Ortega, who was shot; and Moises Galvan, the shooter. To unravel their sharply conflicting stories,

the jury was presented with video footage from a nearby security camera, DNA evidence from the handgun, and testimony of several non-eyewitnesses.

### A. The State's case

David Ortega testified that he and Rogelio Franco, Jr. were best friends. On the day of the shooting, he met up with Franco around 4:00 p.m. Before going to the Bar Fly, they went to the home of Franco's co-workers and snorted cocaine, spent some time with Franco's family, went to two other bars, then left for the Bar Fly, snorting more cocaine on the way. Video footage showed Franco and Ortega entering the bar at 11:55 p.m.

Ortega testified that when they went to a patio area at the Bar Fly, Galvan approached Franco, stating "You're Sosa" (Franco's Instagram name); "You know who the f--k I am." Galvan responded, "Let's pick in private"; "Come on, let's go talk in private, homey. I'm 19 years old. You're scared." Ortega testified that he had never seen Galvan before. The three then left the bar.

Once outside, Ortega turned to respond to two men who had followed the group out. When Ortega focused back on Galvan and Franco, Franco was facing him. Galvan was between the two. Ortega observed Galvan run toward Franco then saw the flash of a gun discharging. In his statement to the police the week after the shooting, Ortega estimated that Galvan and Franco were four feet apart when Galvan leaned forward and shot Franco. According to Ortega, there was no fight or struggle. Ortega denied having a gun on him, and he did not see Franco with a weapon. Ortega ran toward Franco and was shot two times in the chest by Galvan, then once in the hand as he tried to run away. Ortega spent seven days in the hospital and has lost much of the function of his hand.

At the time of the shooting, Ortega was on felony probation; his drinking and use of cocaine violated the terms of his probation. At the time of this trial, he was on probation for DUI. He denied making any deal or being promised anything in exchange for his testimony.

The State also offered the testimony of Nicholas Gomez, a deputy constable with the County of El Paso, who was working off-duty at the Bar Fly the night of the shooting. He was inside an unmarked patrol unit when, around midnight, he heard five or six gunshots. As he went toward where the shots were fired, he saw a person, later identified as Galvan, running away. Gomez saw a dark object in Galvan's right hand. Though Gomez was in full uniform, Galvan refused to stop when ordered to do so. As Gomez pursued Galvan on foot, he no longer saw the dark object in Galvan's hand. He was able to get Galvan on the ground with his taser. Galvan would not comply with commands to show his hands until Gomez tazed him twice more.

After Galvan was handcuffed and secured in a police car, Gomez retraced his steps looking for the black object. He located a Ruger semi-automatic pistol under a vehicle. The weapon was later confirmed as the one used to shoot both Ortega and Franco. The police recovered five spent shell casings at the scene from the Ruger. One spent casing was still in the chamber and no unfired rounds remained. Gunshot residue was found on Galvan's hand.

Franco sustained three bullet wounds—one to the neck, one to the chest, and one to the arm—all from front to back. The chest and neck wounds perforated both lungs, resulting in significant internal bleeding and death. One of the wounds showed powder stippling, indicating that the gun was anywhere from six inches to six feet when fired. A toxicology screen found alcohol, cocaine, metabolites of cocaine, and marijuana in his system. A cell phone found on Franco's person contained a dollar bill and a white powdery substance.

The police had the Ruger analyzed for DNA. The swab found the DNA of two persons on the trigger area and handle. When compared to samples of DNA from Galvan, Ortega, and Franco, the DNA evidence was consistent with Galvan but excluded Ortega and Franco. The State's DNA analyst conceded it was possible that another person could have handled the gun but left no recoverable DNA on the weapon.

3

**B. Galvan's version of events**

Galvan admitted to shooting Franco and Ortega but claimed he did so in self-defense. His case relied in part on his history with Franco, which he said always ended in violence.

Galvan testified that in 2013, a large group of men, which included Franco, beat and stabbed him. The group exited a car while Galvan was walking home alone. Franco held Galvan's arms while others in the group beat, punched, and kicked him. Galvan was stabbed in the back with an unknown weapon. The wounds punctured his lung, requiring a one-day hospital stay.[1] Galvan did not call the police. The police went to the hospital to take a statement, but he did not identify his assailants out of fear of retaliation against him and his family.

Another incident occurred at the Tipsy Tiger Bar a few months before the shooting. Galvan testified that a woman who was with Franco began looking at him, which caused Franco to confront Galvan, yelling expletives. Franco's friends held him back and then ushered him out of the bar. Galvan waited 20 to 30 minutes before trying to leave the bar only to find Franco and his friends waiting at the exit. Someone in Franco's group punched Galvan, knocking him to the ground, and the group began kicking, punching, and breaking a beer bottle on him. When the bouncers broke up the fight, Franco and his group fled. Galvan also introduced testimony from Magay Castaneda that Galvan came to her apartment later that night and was "pretty beaten up." Galvan introduced testimony from his cousin, Rudy Galvan, to corroborate his story about being beaten up by Franco and a group of eight or nine others that night.

Galvan had encountered Franco at a local gym two or three times. Franco would gesture towards Galvan and point at him, making him feel unsafe. Galvan transferred his membership to another gym location.

---

[1] The hospital record contains a history that Galvan was assaulted by two people at the "Yellow Rose Apartment."

Galvan testified that on the night of the shooting, he went to the Bar Fly with his then-girlfriend (Roxy), Raymond Solano, and Roxy's brother (Luis Ruiz). They arrived at the bar at 11:30 p.m. Galvan was 19 years old at the time and used Solano's ID to get in once Solano was already in the bar. Galvan testified that he noticed Franco and Ortega in the bar. Cursing, Franco approached him. Galvan tried to leave, when Franco asked, "Where are you going bitch?" You're not going nowhere." Galvan asked, "Why you sons of bitches always messing with me?" Franco then flicked a lit cigarette at Galvan's face, causing a burn.[2] Galvan turned to leave the bar, and Franco threw a drink at him.

Franco and Ortega followed him out of the bar with Franco still cursing at him. Galvan feared that Franco was there with his usual larger group, but he could not see well because of his "watery" vision, which he attributed to the cigarette burn. They were in a dark area of the strip mall. Galvan testified that he was "terrified, panicking" and "did not know what to do." Galvan described Franco as six feet tall and 225–250 pounds, while Galvan at the time was 5'7 and 150 pounds. Other evidence revealed that Franco was a body builder.

As Franco was still taunting Galvan, Ortega started running toward him and pulled a dark object from his pocket, placing it at Galvan's chest. Ortega said something to the effect of "It's loaded. It's loaded" and "Let's fucking get him." At the same time, Franco was "picking up his pants" and moving toward Galvan with a fighter's stance. Galvan told the jury he thought they were going to kill him, so he wrestled the gun from Ortega. The gun discharged, and Galvan recalled firing once more as Ortega came towards him. After that, "everything kind of just went blank." But he did recall Franco throwing a punch in Galvan's direction. Galvan did not remember how many times he fired the weapon: "It happened so fast. Just was blank. I don't remember. I

_____

[2] When Ortega testified, he denied that Franco flicked a cigarette at Galvan. Galvan introduced a selfie from earlier in the evening that did not show any mark on his face. State's Exhibit 46, taken after the arrest, shows a mark on his right cheek.

remember -- the last thing I remember was shooting the weapon and running away." Acknowledging that he had the weapon at that time, Galvan said he did not know if Franco, Ortega, or the others were armed.

He next recalled running out of fear, and upon tripping, being tased by the sheriff's deputy. Galvan was arrested and gave the detectives a video statement later that morning. In the statement, he first claimed he was not involved in the shooting. He told the police he had just dropped off Roxy, Luis, and Ray at the bar, went home, then went back to the bar to pick them up. There were other inconsistencies in his statement. He told the detective that he tried to get into the bar alone and was turned away by the bouncer but later snuck in. (The video showed him and Roxy entering together.) Galvan also said in the statement that Franco was already in the bar when he arrived. He said he left with Roxy, but the video shows him leaving followed by Franco. Galvan testified at trial that he first lied to police to keep his girlfriend and Solano out of trouble for their help in using Solano's ID to get into the bar.

After the detective intimated that they had video footage showing what happened, Galvan changed his story and made the self-defense claim. He admitted to knowing Franco and Franco's Instagram account with the "Sosa" name. He told police that a person named "J" (RJ are Franco's first two initials) had earlier tried to rob Galvan of his shoes and had stabbed him. Galvan admitted to the verbal confrontation in the bar and to calling Franco and Ortega "old ass niggers." In his statement, Galvan claimed that once outside, Ortega ran up to Galvan with what Galvan hoped was just a BB gun. Galvan tackled him and wrestled the gun from Ortega. At another point in his statement, he told police he ran up behind Ortega and took the gun away, thinking Ortega was playing.

Galvan called a deputy with the Hudspeth County Sheriff's Office who testified that Franco has a reputation for assaultive conduct. A bouncer from the Bar Fly also believed Franco had a

6

character for assaulting people and being aggressive. The bouncer testified that Franco was a "regular," and he and those with him were often waived in if there was a line. They would not go through a secondary pat-down others might go through. Although the bouncer did not see what happened that evening, bar policy would have been to pat down a non-regular like Galvan. The bouncer also told Galvan to pull up his pants so he could see that Galvan did not have a gun tucked in his waistband. But Galvan was wearing a large jacket that could have hidden a pistol.

## II. ISSUES ON APPEAL

Galvan raises six issues for our review. Three issues challenge the jury charge: Issues One and Two raise two missing instructions relevant to the self-defense question, while Issue Five raises the wording of a conditioning instruction for a lesser-included offense question. In Issue Three, Galvan complains of a limitation on his expert witness's testimony. In Issue Four, Galvan contends these collective errors undermined the fundamental fairness of the proceeding. Finally, in Issue Six, Galvan maintains the trial court erred by not dismissing the case for failure to afford Galvan a speedy trial. Because the last issue would yield the greatest relief, we address it first.

## III. SPEEDY TRIAL

Galvan urges us to enter a judgment of acquittal because the State violated his right to a speedy trial. Galvan spent six years and eight months in jail awaiting the trial that would reach a final verdict. As we discuss in more detail below, the crux of his argument is that an earlier trial (set two years and four months after his arrest) ended in a mistrial after a prosecutor asked an improper question. Thereafter, the case was delayed by the COVID-19 pandemic, an appeal to this Court, and the recusal of the original trial judge.

## A. Chronology

Galvan was arrested on January 29, 2017. The trial court set the case for trial four times over the next two years.[3] Nothing in the record before us explains why these settings were not reached, even though three were specially set. The record contains no motions for continuance or hearing transcripts explaining why a subsequent order reset the case for trial at a later date.

The case reached trial on May 9, 2019. The State presented its case through 22 witnesses over nine days. After the State rested, and when Galvan was on the stand during his case-in-chief, the State's attorney asked Galvan whether another witness had said Galvan "always carries a black Ruger pistol in [his] pocket." By this time in the trial, that witness had invoked the Fifth Amendment and would not testify absent a court order. The trial court had also limited the admission of the witness statement involving the Ruger. Galvan did not answer the question before the trial judge stopped the proceedings and excused the jury. Following a hearing, the trial court granted Galvan's mistrial motion. The court's written order contained findings that the prosecutor's question was improper and "permanently prejudiced the jury on a key linchpin fact issue in the case," which "prejudice cannot be overcome." The trial court held the prosecutor in contempt but declined to reach the question of prosecutorial misconduct in its mistrial order.

The case was then set for trial on August 6, 2019, but reset for January 28, 2020, after Galvan filed a motion for continuance based on his desire for and the court reporter's inability to timely provide a transcript of the first trial. The record does not explain why the case was not tried in January 2020, but there are clues. Galvan's attorney filed a motion on the day set for trial asking for a psychological examination based on his view that Galvan was "experiencing mental issues due to the long-term effect of incarceration." There is no order in the record granting or denying

---

[3] Those settings were for October 12, 2017; April 9, 2018; August 8, 2018; and November 26, 2018.

8

that motion. At the hearing on the speedy trial motion, the State asserted that the January setting was passed because the full transcript of the first trial was still not completed.

Next, the COVID-19 pandemic interrupted court functions starting in March 2020.[4] Other than scheduling conferences and Galvan's counsel moving to withdraw, nothing transpired in the case until January 2022. The trial judge set an emergency hearing for January 11, 2022, to announce that the Texas State Commission on Judicial Conduct had initiated a complaint against him over his conduct in this case.[5] The judge believed that, following the mistrial, the Commission "secretly" contacted the state prosecutors about this case, which he viewed as an improper ex-parte communication. To address that concern, he retained an attorney to represent the 168th District Court whose role would be to communicate with the parties and possibly seek unspecified relief with the Texas Supreme Court or Court of Criminal Appeals. Several weeks later, however, the judge discharged that attorney.

At the January 22 hearing, the judge discussed the prospect that Galvan could claim that the outcome of the prior trial raises a double-jeopardy issue which might result in the dismissal of the charge. The trial court had recently appointed an attorney to pursue available writ remedies. That attorney filed an Application for Writ of Habeas Corpus based on the double-jeopardy theory in January 2022. The judge acknowledged the parties' frustration over the delay, and speaking to

---

[4] First Emergency Ord. Regarding COVID-19 State of Disaster, 596 S.W.3d 265 (Tex. 2020). The last order was issued on October 31, 2022, and expired on January 1, 2023. Fifty-Seventh Emergency Ord. Regarding COVID-19 State of Disaster, 683 S.W.3d 776 (Tex. 2022).

[5] The duly elected judge for the 168th who presided over the first trial and the case up to this point was the Hon. Marcos Lizarraga. The Judicial Conduct Commission's formal charge, which was later attached as an exhibit filed in the clerk's record, contained four counts: "Bias Against the State"; "Improper Relationship with and Bias Towards the Defense"; "Improper In-Chambers Hearing"; and "Failure to Cooperate with the Commission's Investigation." On April 11, 2025, the Commission issued a public admonishment to Judge Lizarraga related only to *ex parte* communications during the trial. Public Admonition of Hon. Marcos Lizarraga, 88 Tex. B.J. 469 (June 2025) (Tex. Comm'n on Jud. Conduct).

the COVID-19 pandemic, stated, ". . . I am almost sure that there has not been a jury murder trial case in the courthouse since March of 2020."

In late February 2022, the State moved to recuse the trial judge based on him being a witness in the case. The allegation tracked one of the several charges that the Commission had brought against the judge. After the judge declined to voluntarily recuse himself, the Hon. Sid Harle, sitting by assignment, granted the recusal motion on March 31, 2022, reasoning that the trial judge reported potential criminal conduct and thus made himself a witness. The Hon. Stephen Ables, Presiding Judge for the Sixth Administrative Region, was appointed to handle the case. On June 6, 2022, Judge Ables heard and denied the application for habeas corpus.[6] Judge Ables reasoned that the original order granting the mistrial made no mention that the mistrial constituted double jeopardy. Additionally, Judge Ables found that the objectionable question asked by the prosecutor was never answered by the witness and an "instruction to the jury to disregard the question was sufficient to cure any harm."

Galvan immediately appealed that ruling to this Court. He moved to stay all trial court proceedings pending a final decision on the appeal. The State opposed the motion. While that motion was not ruled on, we note that Galvan's original trial attorneys were permitted to withdraw on July 11, 2022, and August 18, 2022, and his new trial attorney was not appointed until September 8, 2022.

On November 2, 2022, this Court denied Galvan's appeal. *Ex parte Galvan*, No. 08-22-00096-CR, 2022 WL 16630942 (Tex. App.—El Paso Nov. 2, 2022, pet. ref'd) (not designated for publication). As stated in our opinion, the relevant standard under the double jeopardy analysis

---

[6] Galvan separately brought Applications for Writ of Habeas Corpus based on excessive bail, one of which was appealed to this Court. *Ex parte Galvan*, No. 08-22-00229-CR, 2023 WL 2541358 (Tex. App.—El Paso Mar. 16, 2023, pet. ref'd) (not designated for publication). Because these applications did not delay the trial settings, we do not consider them in our chronology.

required Galvan to "show the prosecution engaged in conduct intended to provoke the defendant into moving for a mistrial." *Id*. at *4. We concluded that Galvan failed to meet that burden and had not briefed how the record met a six-factor test applicable to this core question. *Id.* at *5. We independently reviewed the record under the test and concluded that it supported the trial court's finding that the State did not intentionally engineer a mistrial. *Id*. at *5–6.

Galvan filed a petition for discretionary review with the Texas Court of Criminal Appeals which was finally rejected on January 25, 2023. Our mandate issued on February 24, 2023. The case was reassigned to the Hon. Dick Alcala. Judge Alcala heard and overruled Galvan's motion seeking to dismiss that case based on his speedy trial claim. The case was then tried to a verdict from September 15 to 23, 2023.

## B. Standard of review and controlling law

The Sixth Amendment to the U.S. Constitution, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, guarantees defendants a right to a speedy trial. *See* U.S. CONST. amend. VI; *Klopfer v. State of North Carolina*, 386 U.S. 213, 222–26 (1967); *State v. Lopez*, 631 S.W.3d 107, 113 (Tex. Crim. App. 2021). When a defendant claims that his right to a speedy trial has been violated, courts examine four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Lopez*, 631 S.W.3d at 113. Courts must weigh the strength of the *Barker* factors and balance their relative weights considering the State's conduct and the defendant's conduct. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008).

The evidentiary burden differs depending on the *Barker* factor at stake. The State carries the burden to justify the length of the delay. *Id.* at 280. The defendant carries the burden to show the delay is "presumptively prejudicial" and to prove he asserted his right and suffered prejudice. *Lopez*, 631 S.W.3d at 113–14. The defendant's burden of proof on assertion of the right and

11

prejudice "varies inversely" with the State's degree of culpability for the delay. *Cantu*, 253 S.W.3d at 280 (quoting *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)). "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Id.* at 280–81.

In reviewing the *Barker* factors, we apply a bifurcated standard of review. *Lopez*, 631 S.W.3d at 113–14. We review factual components under an abuse-of-discretion standard and legal components de novo. *Id.* at 113–14. Consequently, we will defer to explicit or implicit findings if they are supported by the record and sustain the trial court's ruling. *Id.* at 114. Engaging in the *Barker* speedy-trial analysis on appeal requires us to assess each factor individually yet balance them holistically. *Id*. In the end, we must uphold the trial court's ruling if it finds support in the record and is correct under any applicable theory of law. *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003).

### C. Application

#### (1) Length of delay

The first *Barker* factor—the length of delay—is a threshold factor. A defendant carries the burden to show that the delay is presumptively prejudicial. *Lopez*, 631 S.W.3d at 113–114. A defendant satisfies that burden by convincing the reviewing court that the delay in the case has crossed the threshold dividing ordinary from presumptively prejudicial delay. *Id.* at 114 (citing *Doggett v. U.S.*, 505 U.S. 647, 651–52 (1992)). Because the length of delay in each case depends on the circumstances of that case, there is no formula to determine what is presumptively prejudicial. *Lopez*, 631 S.W.3d at 114. Even so, there are signposts. A delay approaching one year can trigger the *Barker* speedy-trial analysis. *Balderas*, 517 S.W.3d at 768. A delay exceeding three-and-a-half years is well beyond the minimum necessary to trigger the analysis. *Id*.

Here, the delay of over six years between Galvan's arrest and his last trial is sufficient to trigger a complete *Barker* speedy-trial analysis. This factor weighs heavily in favor of finding a speedy-trial-right violation. *See Balderas v. State*, 517 S.W.3d 756, 768 (Tex. Crim. App. 2010) (eight-year delay); *Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002) (en banc) (nearly-four-year delay); *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003) (three-and-a-half-year delay).

### (2) Reasons for delay

The second *Barker* factor addresses the reasons for the delay. The State bears the burden to justify the length of the delay. *Cantu*, 253 S.W.3d at 280. In assessing the State's justification, "we assign different weights to different reasons." *Balderas*, 517 S.W.3d at 768. A deliberate attempt to delay trial to hamper the defense is weighed heavily against the State. *Barker*, 407 U.S. at 531. More neutral reasons, such as negligence or crowded dockets, are also weighed against the State, but less heavily than deliberate delay. *Id*. Valid reasons are not weighed against the State at all. *Id*. Delay attributable in whole or in part to the defendant may constitute a waiver of the speedy-trial claim. *State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999) (en banc). When the record is silent as to the reason for the delay, we may presume neither a valid reason nor a deliberate attempt to prejudice the defense. *Dragoo*, 96 S.W.3d at 314. Therefore, when the record is silent, the second *Barker* factor weighs against the State, but not heavily. *Id.*

For ease of discussion, we segment the history of this case into four time periods: (1) from arrest to the first trial; (2) from the mistrial to the Texas Supreme Court's first COVID-19 order; (3) the COVID-19 period; and (4) from the change of judges to eventual retrial.

### (a) Arrest to the first trial

A little more than two years and four months passed between Galvan's arrest and the first trial. The State is accorded a reasonable amount of time to prepare a case for trial. *See State v.*

13

*Vasquez*, No. 08-16-00089-CR, 2018 WL 4178462, at *6 (Tex. App.—El Paso Aug. 31, 2018, no pet.) (not designated for publication) (finding a six-month delay acceptable); *Rivero v. State*, No. 08-02-00191-CR, 2004 WL 42625, at *4 (Tex. App.—El Paso Jan. 8, 2004, no pet.) (not designated for publication) (agreeing the State is entitled to some time, but finding ten months was too long and would count against the State, although not heavily). The rest of the delay between arrest and the first trial is unexplained by the record. The case was set for trial four other times (three of which were special settings), but nothing in our record explains why these earlier settings were not reached. Discounting the first eight months for trial preparation in a murder and aggravated assault case, we count the remaining one-year-and-eight months against the State, but not heavily. *See Dragoo*, 96 S.W.3d at 314 ("In the absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay.").

### (b) From mistrial to the first COVID-19 order

Galvan maintains that the State's conduct leading to the mistrial amounts to bad faith. He also claims the State filed allegations against the judge with the Commission, leading to his recusal, but only after the State waited over two years to move for recusal. Galvan contends the entire period of delay from mistrial to the second trial must be charged against the State. However, the record leads us to a different conclusion.

We find no evidence in the record that the State's prosecutors secured the charges by the Commission or were even aware of the charges until the trial judge disclosed them at the January 2022 emergency hearing. As for the mistrial argument, both Galvan and the State urged their arguments at the speedy-trial dismissal hearing. In denying the motion, Judge Alcala impliedly found that the State's improper question was not in bad faith, but rather an error in judgment at most. *See Doggett*, 505 U.S. at 656–57 (acknowledging a middle ground between

14

"diligent prosecution and bad-faith delay" that it termed "official negligence"). We cannot conclude that Judge Alcala abused his discretion in making that implied finding. There is a second facet to this issue. Judge Ables, in denying the double-jeopardy writ, concluded that a mistrial was not necessary, as the objectionable question was never answered by the witness and an "instruction to the jury to disregard the question was sufficient to cure any harm." Though this finding is at odds with the original trial judge's findings, we need not resolve the conflict because even if the mistrial was appropriate and caused by the State, the case could have been promptly retried before the COVID-19 pandemic.

The case was reset for trial on August 6, 2019, under the trial court's June 6th order granting a mistrial. But Galvan quickly filed a motion to continue that setting. While the court did not issue an order on the motion, it issued a new setting for January 28, 2020, the same day the motion was set for hearing. Galvan based the continuance motion on the time it would take the court reporter to transcribe the entire 2500 pages of the first trial. The motion is a tacit admission that Galvan was not ready to go to trial in August. While it is true that but for the mistrial, Galvan would not have been requesting a trial transcript. Yet that was a choice he made.[7] Stated otherwise, the mistrial gave Galvan the opportunity to obtain sworn testimony from each of the witnesses who testified at the first trial, and he decided that the benefit of those statements was more valuable than a quick resetting of the case.

The case was then reset to January 28, 2020, but not tried on that date, as Galvan's counsel filed a motion seeking a psychiatric exam of his client. At the speedy-trial hearing below, the State asserted that the full transcript of the first trial was still not completed by the time of the January

---

[7] At the speedy-trial hearing below, Galvan faults the court reporter for not being able to produce the transcript within 120 days as contemplated by the Texas Government Code (and thus claims the delay must be charged against the State). Tex. Gov't Code Ann. § 52.047. While we are aware of the heavy workloads and time demands on official court reporters, we decline to penalize the State for a delay when there is no indication in the record that Galvan sought the intervention of the trial court to expedite the record.

trial setting. So while we charge the three-month delay between the May and August settings against the State based on "official negligence," we cannot charge the entire period since the mistrial against it, as trial was available twice before the COVID-19 pandemic.

### (c) The COVID-19 period

Some periods of delay can be assigned neither to Galvan nor the State. The suspension of and then later limitations on jury trials because of COVID-19 fit that category. *Schuman v. State*, No. 11-22-00300-CR, 2024 WL 847692, at *9 (Tex. App.—Eastland Feb. 29, 2024, pet. ref'd) (mem. op., not designated for publication); *see also State v. Conatser*, 645 S.W.3d 925, 930 (Tex. App.—Dallas 2022, no pet.) (same); *but see Lovelace v. State*, 654 S.W.3d 42, 49 (Tex. App.—Amarillo 2022, no pet.) ("[W]hile the State's stated reason for the delay is a neutral reason, there existed an option that might have allowed the trial to have been held even during a pandemic."). Although some delays, like overcrowded courts, can still count "less heavily" against the State, we are reluctant to put the early phase of the COVID-19 pandemic in that category.[8]

### (d) Recusal of the original trial judge to eventual retrial

The original trial judge was recused on March 31, 2022, based on a February 2022 motion. The ground for recusal arose from the trial judge witnessing conduct he believed could have constituted witness tampering, thus making the judge a witness. We cannot ascribe this delay to either the State or Galvan as the delay itself reflects neither negligence nor improper conduct on anyone's part.

On June 6, 2022, the newly assigned judge denied Galvan's Application for Writ of Habeas Corpus. Galvan immediately and unsuccessfully appealed that ruling. The appellate process did

---

[8] The record does not put a clear end date on the COVID-19 period. The original trial judge commented in January 2022 that no murder cases had been tried in El Paso County since the inception of the pandemic. Galvan does not assert an earlier end date, and the parties have not squarely addressed that question in the briefing. We do not reach the issue of when trial courts should have restarted jury trials in criminal cases in El Paso County under the Texas Supreme Court emergency COVID-19 orders.

not terminate until our mandate issued on February 24, 2023. We charge that period of time against Galvan, who made the calculated judgment to pursue that remedy. For several months in that interim period, Galvan's original first and second chair trial counsel both withdrew from the case based on a conflict with Galvan, leading to substitute trial counsel. Any overlapping time period necessary for new counsel to get ready for trial would also be charged against Galvan.

Shortly after this Court's mandate issued, Judge Ables set a status conference and informed the parties of his first available trial date in January 2024. To accommodate an earlier trial setting, Judge Alcala was reassigned to the case, as he was able to preside over the case starting September 15, 2023. We assign any delay after our mandate issued against the State, but only slightly.

In sum, we assign one year and eight months from arrest to the first trial against the State as well as the five months after our mandate issued, but only slightly. We assign a three-month period following the mistrial against the State more heavily. We assign the six-month period from the continued August 2019 trial setting to the start of the COVID-19 pandemic to Galvan. We also assign the nine-month period for the double jeopardy appeal against Galvan. The balance of the delay we assign to neither party. Subtracting the delays attributed to Galvan, we can assign less than a year of delay against the State.

### C. Assertion of right to speedy trial

The third *Barker* factor focuses on the defendant asserting his right to a speedy trial. *Balderas*, 517 S.W.3d at 771. Galvan carries the burden to prove he asserted his right. *Id.* That assertion "should be, at the very least, unambiguous." *Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013). "A defendant's lack of a timely demand for a speedy trial indicates strongly that he did not really want one." *Balderas*, 617 S.W.3d at 771. "The longer the delay becomes, the more likely a defendant who wished a speedy trial would be to take some action to

17

obtain it." *Id.* (internal quotation marks omitted). This factor acknowledges "the reality that defendants may have incentives to employ delay as a 'defense tactic': delay may 'work to the accused's advantage' because 'witnesses may become unavailable, or their memories may fade' over time." *Vermont v. Brillon*, 556 U.S. 81, 90 (2009) (quoting *Barker*, 407 U.S. at 521). "Thus, inaction weighs more heavily against a violation the longer the delay becomes." *Balderas*, 517 S.W.3d at 771 (internal quotation marks omitted).

On April 10, 2019, Galvan filed a "Motion for Speedy Trial" asking that trial, which was already set, commence on May 2, 2019. There is nothing in our record to show that the motion was presented to or ruled on by the trial court. And trial did commence in May 2019. That Galvan only filed the motion on the eve of the first trial underpins our minimization of any delay between arrest and the first trial. The next and only other speedy-trial motion was filed in July 2023 and sought dismissal of the case. "Filing for a dismissal instead of a speedy trial will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one." *Cantu*, 253 S.W.3d at 283. Because Galvan did not meaningfully assert his right to a speedy trial and then only much later sought a dismissal rather than a speedy trial, we conclude that the third factor weighs heavily against him.

### D. Prejudice

The fourth *Barker* factor encompasses any prejudice to the defendant because of the length of delay. Galvan carries the burden to show some prejudice, but a showing of actual prejudice is not required. *Balderas*, 517 S.W.3d at 772. In determining whether a defendant has been prejudiced, we consider the three interests a speedy trial is intended to guarantee: "(1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Id.* at 772. Of these interests, the third

18

"is the most important because the fairness of the criminal-justice system is distorted when a defendant is unable to adequately prepare his defense." *Id.*

Taking these interests in turn, we find that Galvan presented some evidence of prejudice, yet we cannot assign it great weight because none of that prejudice is shown to have impaired his ability to defend himself. Galvan only argued that some witnesses may not be available, something that would not be known until the case was actually tried. In Galvan's brief on the merits, he adds only that witness Richard Pendell could no longer clearly remember events.[9] Pendell was a bar patron who arrived in the parking lot just before the shooting. Galvan called Pendell to show that there had been a fight before the shooting, which would support his self-defense claim. Pendell testified that before hearing gunfire, he recalled a commotion, though he was far away and could not see. When Pendell testified that the events of that evening were hazy, Galvan was able to use Pendell's police statement, which was taken shortly after the shooting, to refresh his recollection and confirm Pendell heard a "fight" before the shooting. Even at that, Pendell had a limited view of the dark scene. Galvan argues no other prejudice.

The U.S. Supreme Court in *Doggett* noted that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove . . . or identify." *Doggett*, 505 U.S. at 655–56. But the high court recognized in the very next sentence of the opinion that "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria . . . ." *Id.* at 656. Moreover, the period of delay that might create presumptive prejudice must be assignable to the State, either through its negligent delay or its intentional conduct. *Id.* at 657–58. As discussed above, we assign only a small portion of the delay to the State, which occurred later in the proceedings. It is hard to conceptualize on this record how that

---

[9] At trial, Galvan again moved to dismiss the case when one witness, Adrian Estrada, was thought to have failed to honor his subpoena. But Mr. Estrada did appear after both sides closed, and the trial court allowed Galvan to reopen to call him as a witness.

19

delay presumptively prejudiced Galvan. Furthermore, any presumptive prejudice that may exist because of the length of the delay is extenuated by Galvan's acquiescence in the delay or his failure to press for the August 2019 or January 2020 trial setting that would have guaranteed him a speedy trial. *See Dragoo*, 96 S.W.3d at 315; *Hopper v. State*, 520 S.W.3d 915, 929 (Tex. Crim. App. 2017).

We assess this fourth *Barker* factor as neutral or, at most, only slightly favoring Galvan. Although we fully acknowledge prejudice to Galvan's person resulting from his lengthy pretrial incarceration, the prejudice is mitigated greatly by his acquiescence in much of the delay and failure to establish that the delay presumptively impaired his defense.[10]

### E. Balancing the factors

While we rely on the trial court's first-hand view to decide facts, we balance the four factors de novo. *Balderas*, 517 S.W.3d at 768. Our de novo review is guided by the Texas Court of Criminal Appeals's cautionary comments:

> Because dismissal of the charges is a radical remedy, a wooden application of the *Barker* factors would infringe upon "the societal interest in trying people accused of crime, rather than granting them immunization because of legal error." Thus, courts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. The constitutional right is that of a speedy trial, not dismissal of the charges.

*Cantu*, 253 S.W.3d at 281 (quoting *United States v. Ewell*, 383 U.S. 116, 121 (1966) (footnotes omitted)).

The length of delay weighs heavily in Galvan's favor. He has shown some prejudice from this delay for its impact on him, but not for the conduct of his defense. The factor that weighs most heavily against Galvan is the failure to meaningfully assert his speedy-trial right, and when he last

---

[10] We note that the Clerk's Record contains two letters Galvan wrote to the judge presiding over his case. But we cannot ascribe significance to unsworn statements made in *ex parte* communications to the court.

20

did so, he sought dismissal and not trial. Finally, while we can ascribe some delay to the State, and some to the judicial system, much of the delay stemmed from factors outside anyone's control or Galvan's conduct. A holistic balance of the four factors does not support Galvan's claim. We therefore overrule Issue Six.

## IV. SELF DEFENSE INSTRUCTIONS

In his first and second issues, Galvan complains of the omission of instructions from the charge on self-defense.

Galvan defended both the murder and aggravated-assault charges by claiming self-defense. The charge as given contained self-defense instructions stating:

> A person's use of deadly force against another that constitutes the crime of Murder is justified by self-defense when the person reasonably believed the degree of force used was immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force.
>
> If a person reasonably believes he is threatened with the use or attempted use of unlawful deadly force against him by a group of two or more people, he may use deadly force against any or all of them.
>
> Self-defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant.
>
> The defendant is not required to prove self-defense. Rather, the state must prove, beyond a reasonable doubt, that self-defense does not apply to the defendant's conduct.
>
> "Reasonable belief" means a belief that an ordinary and prudent person would have held in the same circumstances as the defendant.
>
> "Deadly force" means force that is intended or known by the person using it to cause death or serious bodily injury or force that in the manner of its use or intended use is capable of causing death or serious bodily injury.
>
> To decide the issue of self-defense, you must determine whether the state has proved, beyond a reasonable doubt, one of the following two elements. The elements are that—

21

1.  the defendant did not believe his use of force was immediately necessary to protect himself against Rogelio Franco, David Ortega or any other's use or attempted use of unlawful deadly force; or

2.  the defendant believed his use of force was immediately necessary to protect himself, but the defendant's belief was not reasonable.

A similar instruction was given for the aggravated-assault count and for the lesser-included offenses of deadly conduct.

In his first issue, Galvan contends the trial court must have also included an instruction that the jury should presume his conduct was reasonable, per Penal Code § 9.32, which states in relevant part:

(b)  The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision *is presumed to be reasonable* if the actor:

(1)  knew or had reason to believe that the person against whom the deadly force was used:

.    .    .

(C)  was committing or attempting to commit [murder];

(2)  did not provoke the person against whom the force was used; and

(3)  was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

Tex. Penal Code Ann. § 9.32(b) (emphasis added).

In his second issue, Galvan contends the charge should have also included an instruction that he had no duty to retreat, drawn from Penal Code § 9.32:

(c)  A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force.

Tex. Penal Code Ann. § 9.32(c).

22

### A. Controlling law

A person is justified in using non-deadly force against another when and to the degree that person reasonably believes the force is immediately necessary to protect himself against another person's use or attempted use of unlawful force. Tex. Penal Code Ann. § 9.31(a). A person is justified in using deadly force if he would be justified in using non-deadly force under § 9.31, and he reasonably believes that deadly force is immediately necessary to protect himself against another's use or attempted use of deadly force. *Id*. § 9.32(a)(2)(A). "The 'reasonably believes' language contains subjective and objective components." *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). To properly raise self-defense, Galvan must have presented evidence that he subjectively believed Franco or Ortega used or attempted to use deadly force against him and that his use of deadly force was immediately necessary. *Id*.[11] And Galvan's subjective belief must have been reasonable. *Id*.

The trial court is required to give the jury a written charge "setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14; *Vega v. State*, 394 S.W.3d 514, 518 (Tex. Crim. App. 2013). Self-defense is "law applicable to the case" and must be included in the jury charge if raised by the evidence. *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) (citing *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007)). In assessing that evidence, we do not consider its strength, whether it is contested, its credibility, or the ultimate viability of the defense. *Id.*

---

[11] The defendant has the burden of producing some evidence to support a self-defense claim. *Lozano,* 636 S.W.3d at 32. If the defendant does so, then the State carries the burden of persuasion regarding the raised defense. *Id*.

A presumption that favors the defendant must be submitted to the jury "if there is sufficient evidence of the facts that give rise to the presumption . . . unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact[.]" Tex. Penal Code Ann. § 2.05(b)(1); *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011).

## B. Standard of review

"A jury-charge-claim analysis involves two steps: First, we determine whether the charge is erroneous. If it is, then we must decide whether the appellant was harmed by the erroneous charge." *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022) (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013); *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005) (en banc)). In general, there are two standards of review for jury-charge-error claims. *Alcoser*, 663 S.W.3d at 165 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)). When, as here, charge error has been properly preserved, we should reverse if the error resulted in "some harm." To decide whether there was some harm, we consider the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011). The harm must be actual, not merely theoretical. *French v. State*, 563 S.W.3d 228, 235 (Tex. Crim. App. 2018).

## C. Application

The jury faced two questions in deciding self-defense. The first question is: who brought the gun? The State, relying on DNA evidence showing that Galvan's but not Ortega's or Franco's DNA was found on the trigger and handle, maintains that Galvan had the gun in his jacket the entire evening. Galvan, however, insists that Ortega first had the gun, which Galvan only took away when it was thrust in his chest. Neither of the omitted instructions that Galvan complains of would address that question.

24

The second question, relevant only if the jury believed Ortega first brandished the gun, is whether Galvan's actions after taking the gun were reasonable. For this inquiry, Galvan contends he was entitled to a charge stating that his actions, such as firing the weapon six times at Franco and Ortega, should be presumed to be reasonable. Galvan also argues that the jury should have been instructed that he had no duty to retreat, which could be important to the jury's resolution of this second question.

On appeal, the State first counters that Galvan was never entitled to any self-defense instruction. It reasons that once Galvan took the gun away from Ortega (if that is what happened), Galvan had the only weapon, and his use of deadly force was not immediately necessary.[12] Next, the State responds that Galvan is not entitled to the presumption of innocence instruction unless: (1) he had reason to believe that the person against whom he used deadly force was committing or attempting to commit murder; and (2) Galvan was not otherwise engaged in criminal activity. The State argues Galvan lacked any reasonable belief that Ortega or Franco were attempting to murder him, and once Galvan possessed the weapon, he was in breach of the law by unlawfully carrying a weapon. *See Finch v. State*, No., 05-15-00793-CR, 2016 WL 2586142, at *6 (Tex. App.—Dallas May 4, 2016, pet. ref'd) (mem. op., not designated for publication) (holding that defendant was not entitled to presumption request because he was in violation of felon-in-possession statute at time of shooting). The State contends the same arguments answer Galvan's request for the no-duty-to-retreat instruction. Finally, the State maintains Galvan suffered no harm from the absence of the instructions. We agree with this no-harm claim and rest our decision there.

---

[12] For this proposition, the State cites several cases where courts found sufficient evidence to support a jury's implied rejection of a self-defense claim where the defendant took away the weapon the victim had first brandished. *See e.g.*, *Hernandez v. State*, No. 05-06-01238-CR, 2008 WL 588902, at *5 (Tex. App.—Dallas March 5, 2008, pet. ref'd) (mem. op., not designated for publication) (defendant who claims to have taken gun away from deceased); *Fugon v. State*, No. 14-06-00204-CR, 2007 WL 836712, at *4 (Tex. App.—Houston [14th Dist.] March. 20, 2007, pet. ref'd) (mem. op., not designated for publication) (same from struggle over shotgun). We agree with Galvan that those cases do not support the different proposition that proper self-defense instructions are not required of the charge.

Assuming without deciding that the instructions should have been given, we find that the "some harm" standard for reversible error is not met.[13] In assessing harm, we first look to the charge as a whole. *French*, 563 S.W.3d at 235. The erroneous omission of a confession-and-avoidance defense, such as self-defense, "is generally harmful because its omission leaves the jury without a vehicle by which to acquit a defendant who has admitted to all the elements of the offense." *See Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013). The charge here, however, included the above-mentioned instructions on self-defense that provided an acquittal vehicle. The instructions were included four times: once for the murder, once for the aggravated assault, and then again for each of the two lesser-included deadly conduct portions of the charge. The instructions required the jury to consider whether Galvan had a "reasonable belief" that Ortega or Franco were attempting to use unlawful deadly force against him. But, Galvan argues, nothing instructed the jury on presumptions or that he had no duty to retreat.

In considering the entire state of the evidence, as we must, *id*., the argument for "some harm" falters. As noted above, neither of the two absent instructions would have any force if Galvan was the person who first brandished the gun. And the evidence on that point is sharply against Galvan. DNA from two contributors was found in the trigger area and handle of the gun. That DNA was entirely consistent with Galvan but excluded Ortega and Franco.[14] Galvan's response to the DNA evidence does not get past the hurdle. While he elicited a concession from

---

[13] The State contends that Galvan never expressly asked for a *deadly force* presumption-of-reasonableness instruction. If the error was not preserved, we would look to see if Galvan suffered egregious harm. *Almanza*, 686 S.W.2d at 171. But we disagree with the State's view of the charge conference. The parties and court understood the charge addressed the use of deadly force, which was the crux of both the murder and aggravated assault charges. In responding to Galvan's request for this instruction, the State's attorney expressly referenced the "use of deadly force."

[14] The DNA analyst's report, which was admitted in evidence, stated: "Obtaining this mixture profile is 58.5 quintillion times more likely if the DNA came from Mr. Galvan and an unknown individual than if the DNA came from two unrelated, unknown individuals. Based on the likelihood ratio result, Mr. Galvan cannot be excluded as a possible contributor to the profile. Mr. Franco Jr. and Mr. Ortega are excluded as contributors to this profile."

the DNA analyst that it was "possible" another person's DNA might have been on the gun but not picked up in the swab, the likelihood of that possibility is never quantified. Nor is there any explanation for how Ortega could have wrestled with Galvan over the gun and only Galvan's DNA was left on the gun. Galvan suggested at trial that the shot to Ortega's hand occurred when the gun discharged during the struggle, but the first thing the DNA analyst looked for was blood on the weapon. She found none.

Galvan also asked the bouncer who checked IDs if Franco, Ortega, or Galvan could have bypassed a secondary screening for weapons at the bar. The most the bouncer could say—because he was not doing the screening that night, nor did he witness it—was that Ortega might have not been screened because he was with Franco who was a bar-regular, but Galvan was not. The testimony is speculative of what actually happened or even what the screening consisted of. Unless the jury got past the hurdle of who brought the gun to the fight, neither of the complained-of omissions in the charge would matter.[15]

The "ordinary and prudent person" standard also operates to limit a defendant who harbors unreasonable beliefs that the use of deadly force is immediately necessary. *Lozano v. State*, 636 S.W.3d 25, 30, 32–33 (Tex. Crim. App. 2021). Here, Galvan claimed to have shot Ortega and Franco out of fear that they or other unknown persons in the area might have other weapons. But there was no evidence that Ortega and Franco had any other weapons, and the only other persons in the area were Galvan's companions. Added to this, Galvan fled the scene. His first statements

---

[15] Even if we were to assume that the jury could have believed Ortega brought the gun, Galvan's evidence for self-defense was exceedingly weak. Ortega never expressly threatened to shoot Galvan. Ortega and Galvan never had any prior dealings. Rather, Galvan's testimony was that Ortega put the dark object on Galvan's chest and said it was loaded. Galvan thought the dark object could have been a BB gun, but when it discharged once during the struggle to take it away from Ortega, he realized it was a real firearm. At that point, he had the weapon and then fired it five more times. Galvan did not justify the five additional rounds but instead testified that he went blank after the first round. *See Lozano v. State*, 636 S.W.3d 25, 30, 32–33 (Tex. Crim. App. 2021) (finding no egregious harm in deficient self-defense instruction where defendant failed to explain why he continued to shoot victim after the first bullet).

to the police denied any involvement in the shooting. Then, when confronted with the prospect that the events may have been captured on video, he made the self-defense claim.

We conclude that the state of the evidence undermines any argument that the absence of the two additional instructions caused Galvan "some harm."

The jury arguments also undermine any claim of harm. The State's jury argument was built on the premise that Galvan had the Ruger hidden in his jacket when he went to the Bar Fly. The State never acknowledged that Ortega could have brought the gun and thus never argued that Galvan's actions once he took the gun were unreasonable. Nor did the did the State claim at trial that Galvan should have retreated after securing the gun from Ortega. Rather, the State's attorney used variations in Galvan's story over wrestling the gun away to argue that it "didn't happen." The State ultimately contended Galvan was mad over being beat up several months earlier at the Tipsy Tiger and took the opportunity to get revenge when he saw Franco at the bar the night of the shooting. None of these jury arguments would have caused Galvan harm in terms of the two complained-of instructions.

In sum, considering the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in our record, we conclude that any error in the omission of additional self-defense instructions is theoretical and not actual. *See Parker v. State*, No. 06-18-00155-CR, 2019 WL 2843743, at *4 (Tex. App.—Texarkana July 3, 2019, no pet.) (mem op., not designated for publication) ("That said, even assuming, without finding, that the trial court erred when it failed to include the complained-of language in its jury charge, [Appellant] cannot show that she suffered the requisite harm."); *Gonzales v. State*, 474 S.W.3d 345, 353 (Tex. App.—Houston [14th Dist.] 2015, pet. refused) (finding error in refusal to submit any self-defense instruction but no harm under the "some harm" standard based on the strength of the evidence and argument of counsel). Accordingly, we overrule Issues One and Two.

28

# V. EXCLUSION OF EXPERT OPINION

In his third issue, Galvan challenges the exclusion of his psychologist expert witness.

## A. The challenged opinion

Dr. James Schutte is a licensed psychologist. He has conducted assessments of persons for competency to stand trial, mental state (sanity) at the time of an alleged offense, and mitigation in sentencing matters. Schutte interviewed and administered a battery of tests to Galvan and reviewed witness statements in the case. He diagnosed Galvan with post-traumatic stress disorder (PTSD), major depressive disorder, and a neurocognitive disorder. Galvan offered Schutte to testify that:

- Galvan subjectively believed that Franco and Ortega were using or attempting to use unlawful deadly force against him and that his use of deadly force in response was immediately necessary. This included his firing the weapon until he felt that the threat was no longer present.

- Galvan's beliefs were reasonable as an ordinary and prudent person in his position would have believed that Franco and Ortega were using or attempting to use unlawful deadly force against him and that his use of deadly force in response was immediately necessary.

- An ordinary and prudent person in Galvan's shoes would have thought he was fighting for his life and would have continued shooting Franco and Ortega because he believed it was necessary to save his life.

- Factors such as the darkness of the location, multiple assailants, and the prior assaults of Galvan by Franco and other assailants in the past contribute to the opinion that Galvan's beliefs were reasonable, and these factors would cause a reasonable and prudent person in Galvan's position to act in the way that he did.

- Galvan was suffering from Post-Traumatic Stress Disorder (PTSD) at the time of the shootings in this case. The PTSD was caused by previous interactions with Franco and his group. The PTSD contributed to Mr. Galvan's subjective belief that Franco and Ortega were using or attempting to use unlawful deadly force against him and that his use of deadly force in response was immediately necessary.

The State objected to this testimony because it does not negate the culpable mental state for murder or aggravated assault (as would testimony about insanity), and it would not assist the jury in evaluating the reasonable person standard because the jury was fully capable of

29

doing that on their own. After an evidentiary hearing where Schutte testified about the opinions set out above, the trial court sustained the State's objection to the testimony.

## B. Standard of review

We review a trial judge's decision to admit or exclude evidence under an abuse-of-discretion standard. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court abuses its discretion when the decision falls outside the zone of reasonable disagreement. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Stated otherwise, the trial court abuses its discretion when it acts "without reference to any guiding rules and principles or acts arbitrarily or unreasonably." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We turn to the guiding rules and principles that govern the admission of expert testimony.

## C. Controlling law

For expert testimony, Texas Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. The rule embodies qualification, reliability, and relevance requirements: (1) that the expert is qualified; (2) that the testimony is based on a reliable scientific foundation; and (3) that the testimony is relevant to the issues in the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

The opinion must also be helpful to the jury. Tex. R. Evid. 702. Thus, the expert's knowledge and experience on a relevant issue must be shown to be beyond that of the average juror, and it must be shown that his testimony will help the jury understand the evidence or determine a fact issue. *See Duckett v. State*, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990) (en banc), *overruled on other grounds by Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App.

1993) (en banc). Under this standard, the expert must have "some specialized knowledge on the topic that will 'assist' the jury." *Coble v. State*, 330 S.W.3d 253, 288 (Tex. Crim. App. 2010). Thus, "[t]he question under Rule 702 is not whether the jurors know something about this subject, but whether the expert can expand their understanding in a relevant way." *Id.*

Historically, courts have resisted allowing a witness—even an expert—to testify to the state of mind of another. *See Winegarner v. State*, 505 S.W.2d 303, 305 (Tex. Crim. App. 1974), *overruled on other grounds by White v. State*, 576 S.W.2d 843, 845 (Tex. Crim. App. 1979) (en banc) (upholding exclusion of expert psychiatrist who examined murder defendant who would testify to "hypothetical question that the facts related to him by [the defendant] were 'capable of being interpreted in a way other than having a present intent to commit murder'"); *Jackson v. State*, 548 S.W.2d 685, 692–93 (Tex. Crim. App. 1977) (upholding exclusion of expert who would have testified to the defendant's "state of mind at the time of the alleged offense"); *Fairow v. State*, 943 S.W.2d 895, 896 (Tex. Crim. App. 1997) (en banc) (stating "[i]t is impossible for a witness to possess personal knowledge of what someone else is thinking. The individual is the only one who knows for certain the mental state with which he is acting"). As the explained by the Court in *Winegarner*:

> In general, our courts permit a witness to testify as to his own intention or other state of mind where the same is material . . . . On the other hand, decisions purporting to apply the opinion rule, uniformly exclude the testimony of a witness as to another person's state of mind. It is said that since one person cannot possibly know another's state of mind, his testimony is necessarily based on conjecture.

*Winegarner*, 505 S.W.2d at 305 (quoting Roy R. Ray, Texas Practice: Texas Law of Evidence, § 1428 (3rd ed. 1980)).

We note two exceptions. First, the Texas Court of Criminal Appeals in *Fielder v. State*, 756 S.W.2d 309 (Tex. Crim. App. 1988) created an exception for expert testimony about the mental state of a defendant at the time of a killing where the defendant was a victim of domestic

31

violence. The Legislature later incorporated this exception into the Code of Criminal Procedure Article 38.36.[16] A second exception allows expert testimony on the defense of sanity, which would negate the *mens rea* for the offense. *See Duren v. State*, 87 S.W.3d 719, 734 (Tex. App.—Texarkana 2002, pet. stricken); *Osby v. State*, 939 S.W.2d 787, 790 (Tex. App.—Fort Worth 1997, pet. ref'd).

### D. Application

The trial court excluded Schutte's proposed opinion testimony by reasoning that it would not be useful to the jury because it was just an opinion on whether Galvan was truthful and credible. "[I]f the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial judge gave the wrong reason for his right ruling." *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). We conclude that the trial court did not abuse its discretion.

Galvan relies on Article 38.36(a), which allows a defendant in a murder prosecution to offer "all relevant facts and circumstances going to show the condition of the mind of the accused

---

[16] That provision reads:

(a) In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

(b) In a prosecution for murder, if a defendant raises as a defense a justification provided by Section 9.31, 9.32, or 9.33, Penal Code, the defendant, in order to establish the defendant's reasonable belief that use of force or deadly force was immediately necessary, shall be permitted to offer:

(1) relevant evidence that the defendant had been the victim of acts of family violence committed by the deceased, as family violence is defined by Section 71.004, Family Code; and

(2) relevant expert testimony regarding the condition of the mind of the defendant at the time of the offense, including those relevant facts and circumstances relating to family violence that are the basis of the expert's opinion.

Tex. Code Crim. Proc. Ann. art. 38.36.

at the time of the offense." Tex. Code Crim. Proc. Ann. art. 38.36(a). We have held, however, that this provision does not allow expert testimony on the mental state of defendants in cases that do not involve domestic violence. *Avila v. State*, 954 S.W.2d 830, 839 (Tex. App.—El Paso 1997, pet. ref'd) ("However, we conclude that Section 38.36 was not intended to allow *expert* testimony concerning the state of mind of the defendant at the time of the offense unless such testimony related to the previous domestic relationship between the deceased and the accused."); *see also Johnson v. State*, No. 01-19-00776-CR, 2022 WL 963277, at *12–13 (Tex. App.—Houston [1st Dist.] Mar. 31, 2022, pet. ref'd) (mem. op., not designated for publication) (following *Avila* and agreeing that Article 38.36(b)(1) does not extend beyond domestic violence cases in allowing expert testimony as to mental state).

Next, Galvan directs us to *Fielder*, which, as we set forth above, allows expert testimony about the mental state of a victim of domestic violence. That the Legislature later codified *Fielder* into Article 38.36, but only to the extent of what *Fielder* held, cautions us against judicially expanding the exception. To the extent Galvan urges us to extend *Fielder* to his case, he advances no compelling rationale for doing so.

Finally, Galvan directs us to cases where expert testimony was admitted on a defendant's state of mind in support of self-defense claims. But in each of those cases, the issue on appeal was whether the evidence supported the jury's rejection of the self-defense claim, not whether the expert evidence was admissible in the first instance.[17] The question before us is whether the trial

---

[17] *See Kitchens v. State*, No. 01-18-00518-CR, 2019 WL 6482408, at *1 (Tex. App.—Houston [1st Dist.] Dec. 3, 2019, pet. ref'd) (mem. op., not designated for publication) (noting defense's use of firearms expert who testified to appropriate use of deadly force); *Vasquez v. State*, No. 03-19-00564-CR, 2021 WL 126778, at *1 (Tex. App.—Austin Jan. 14, 2021, no pet.) (mem. op., not designated for publication) (noting defense expert who testified to defendant's PTSD which caused him to become easily upset and have difficulty controlling his anger); *Jones v. State*, No. 05-15-01012-CR, 2017 WL 3275995, at *1 (Tex. App.—Dallas July 25, 2017, pet. ref'd) (mem. op., not designated for publication) (noting defense expert who testified that the defendant suffered from anxiety and depression and suffered from PTSD and could have had a reasonable belief in defending himself).

court abused its discretion in deciding on this record that Schutte's proposed testimony was not admissible. *See Johnson*, 2022 WL 963277 at *12–13 ("We conclude that the trial court's decision to exclude Dr. Brams's testimony during the guilt-innocence phase of trial was not outside the 'zone of reasonable disagreement.'"); *Ernst v. State*, No. 13-06-00064-CR, 2011 WL 5182599, at *4–5 (Tex. App.—Corpus Christi Oct. 27, 2011, no pet.) (mem. op., not designated for publication) (holding that because the psychiatrist's testimony was admissible is at least subject to reasonable disagreement, the trial court did not abuse its discretion in excluding it).

Following the long-held rule that testimony as to another's state of mind is not admissible in this context, and because the evidence did not fall within any exception, we conclude that the trial court did not abuse its discretion. It also followed the long-held limitation of testimony on the truthfulness of a witness. *See Yount v. State*, 872 S.W.2d 706, 709 (Tex. Crim. App. 1993) ("We hold that Rule 702 does not permit an expert to give an opinion that the complainant or class of persons to which the complainant belongs is truthful."). We overrule Issue Three.

## VI. TRANSITIONING INSTRUCTIONS FOR THE LESSER-INCLUDED OFFENSE

In his fifth issue, Galvan complains about a transitioning instruction given to the jury. For both the murder and aggravated assault offenses, the jury was instructed on the lesser-included offense of deadly conduct. For the murder charge, the jury was instructed as follows:

> If you all agree the state has failed to prove beyond a reasonable doubt, one or more of the elements 1 and 2, you must find the defendant not guilty and proceed to consider the lesser included offense of Deadly Conduct.

A substantially similar instruction was given for the aggravated-assault charge. The language in these transitional instructions is typical of "acquit first" charges. *Sandoval v. State*, 665 S.W.3d 496, 532 (Tex. Crim. App. 2022) ("The type of transitional instruction that the trial court gave in this case is often referred to as an 'acquittal first' instruction, because it requires the jury to acquit the defendant of the greater offense before deliberating on the lesser-included offense.").

34

Galvan requested and the trial court refused to include a "benefit-of-the-doubt" instruction, which would state:

> If you find from the evidence, beyond a reasonable doubt, that the defendant is guilty of murder, or – of murder on the one hand, or of deadly conduct on the other, and – but you have a reasonable doubt as to which offense he is guilty, then you must find the defendant guilty of the lesser included offense of deadly conduct.

## A. Standard of review and controlling law

As with Galvan's other charge issues, we first examine whether the trial court abused its discretion in framing the charge, then whether any error requires reversal. *Almanza*, 686 S.W.2d at 171.

Code of Criminal Procedure Article 37.08 provides: "In a prosecution for an offense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense." Tex. Code Crim. Proc. Ann. art. 37.08. Article 37.08 reflects contemplation on the part of the Legislature "that a conviction on a lesser-included offense would necessarily be a verdict of acquittal on the greater offense, not simply a situation where the jury could not agree on the greater offense." *Sandoval*, 665 S.W.3d at 535. But it "says nothing about how deliberations must proceed." *Id*.

In *Sandoval*, the jury was given an acquittal-first instruction. *Id*. at 532. The defendant had requested a benefit-of-the-doubt instruction. *Id*. at 533. The court assumed without deciding that "the jury charge should have included an explicit 'modified acquittal first' instruction and a 'benefit of the doubt' instruction." *Id.* at 537. A modified-acquittal-first instruction allows the jury "to deliberate in the order it sees fit" but requires "that it acquit the defendant of the greater offense before returning a verdict on the lesser offense." *Id.*

Turning to harm, the court found neither "some harm" nor "egregious harm" resulted from the charge as given. *Id*. at 537–38. It noted that the entire charge was read to the jury, so it would

35

be aware of the distinguishing elements between the higher and the lesser-included offenses. *Id*. The court concluded: "We see no practical difference between what these instructions required of the jury and what a 'modified acquittal first' and Appellant's proposed 'benefit of the doubt' instruction would have required." *Id.*[18]

### B. Application

In an opinion before *Sandoval*, we concluded that the absence of a benefit-of-the-doubt instruction was not error where the jury was given an acquit-first instruction, the entire charge was read to the jury, and the jury was instructed to consider the charge as a whole in its deliberations. *Kersey v. State*, No. 08-20-00037-CR, 2021 WL 5860920, at *5 (Tex. App.—El Paso Dec. 10, 2021, pet. refused) (not designated for publication). We followed the Austin and Corpus Christi Courts of Appeals that similarly decided the issue. *See Ruiz v. State*, No. 03-19-00551-CR, 2021 WL 3233858, at *5 (Tex. App.—Austin July 30, 2021, no pet.) (mem. op., not designated for publication); *Benavides v. State*, 763 S.W.2d 587, 589 (Tex. App.—Corpus Christi 1988, pet. ref'd).

We do not read *Sandoval* as overruling this line of cases. But even if it did, we would still confront the conclusion that there is no practical difference between a properly worded acquit-first instruction and benefit-of-the-doubt instruction, at least as in the present case when the jury is fully apprised of the lesser-included offense. *Sandoval*, 665 S.W.3d at 537–38. Accordingly, we overrule Issue Five.

---

[18] The Court did reject two other variants of the transitioning instructions that are not at issue in Galvan's case. *Id*. at 537.

## VII. CUMULATIVE ERROR

In his fourth issue, Galvan argues that the cumulative force of the errors raised in Issues One, Two, and Three merit reversal for a new trial. The State first responds that the issue is multifarious and should be overruled for that procedural reason. On that point, we disagree. Texas courts recognize in some instances that the cumulative force of multiple errors can compound and require reversal, even if the errors individually do not. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (en banc) (explaining as well that unless and until multiple errors are found to have been committed, there can be no cumulative-error effect because non-errors cannot in their cumulative effect create harmful error). The mere existence of multiple errors, however, does not warrant reversal unless they operated in concert to undermine the fundamental fairness of the proceedings. *Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010).

We agree with the State's additional argument, however, that cumulative force of any error here did not undermine the fundamental fairness of the trial. We have assumed without deciding that there was error under Issue One and Two, but that it does not require reversal. We decline to find error under Issue Three. Thus, there is no cumulative force of error requiring reversal. *See Murphy v. State*, 112 S.W.3d 592, 607 (Tex. Crim. App. 2003) ("Because we have found little or no error in the above-alleged points, there is no harm or not enough harm to accumulate."). We overrule Issue Four.

## VIII. CONCLUSION

Galvan is not entitled to an acquittal on the basis of his speedy-trial point of error. Nor is he entitled to a reversal on the basis of the alleged jury-charge errors, the limitation on his expert witness testimony, or the alleged cumulative error.

We affirm the judgment of the trial court.

LISA J. SOTO

June 30, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.